Alexander Del Giorno, J.
These are two claims by lessees of adjoining properties, Beck, who was the owner of a Chevrolet agency, and Kavanaugh, who was the owner of a gasoline service station. These two which were leased business properties were *851 divided by a private street known as Allen .Street, which dead-ended a short distance back of the subject properties.
The two claimants were located on the westerly side of the then Central Park Avenue in Yonkers through which was built the New York State Thruway. None of the property of the lessees was appropriated by the State. This portion of Central Park Avenue for a width of some 30 feet was later converted into the southbound service road of the Thruway.
The claims were for damages for the deprivation of access to and from their respective properties of the claimants by reason of the construction of the Thruway.
The claimants also set forth a second cause of action for negligence and nuisance allegedly committed by the State. These latter claims were dismissed at the beginning of the trial on the ground that they were filed some one and one-half years after the occurrence, and hence were filed too late to meet the terms of the statute.
The State entered into a contract with Corbetta Construction Co., Inc., and Yonkers Contracting Co., Inc., as joint venturers on May 20, 1954, for the construction of the Thruway affecting the subject properties.
The portions of the contract which the court feels affect these claims are:
Page 1 (Special Notes): “ The Contractor will be held entirely responsible for any damages to adjacent buildings or properties as a result of Ms operations.” Page 4 (Special Bridge Notes): “ It is mandatory for the purpose of protecting existing utilities and maintaining traffic on the adjacent roads to use temporary steel sheet piling, payable under Item 83STB, at locations indicated in the plan. ’ ’
The following are excerpts from Special Notes: Page 15 (Contractor shall): “ Maintain traffic on existing Central Park Avenue while the sections of roadway lying to either side of Central Park Avenue are built.” Page 18: “ Utility Relocation at Yonkers Avenue — Before any other work which would disrupt traffic on either Yonkers Avenue or Central Park Avenue in the vicinity of their intersection is begun, the sanitary sewer, storm drain, and water mains must be relocated. # * When these utilities are relocated across Yonkers Avenue and Central Park Avenue, the Contractor shall not close more than % of the width of the street at any time due to his operations. The remaining % of the width must be kept open to traffic. ’ ’ Page 20: u Southbound traffic will be maintained on the west lanes of Central Park Avenue. * * * Yonkers Avenue Bridge-— When the excavation for the bridge site has been completed the *852 construction of the Yonkers Avenue Bridge must be begun. This work must be accomplished in as short a time as possible in order to eliminate the interference with traffic.” Page 25: “ It is the intent under this contract that two-way traffic be maintained at all times between the New York City Line and Station 143, also on Cross County Parkway, McLean Avenue, Clark Street, Yonkers Avenue, Mile Square Road,, and all other roads or streets as mentioned in the Special Notes and at all other locations as ordered by the engineer. In order to accomplish this, the contractor’s attention is directed to the requirements in the Special Notes under the heading ‘ Sequence of Construction Operations.’ * * * The construction of temporary pavement connections for the purpose of maintaining traffic as mentioned under Sequence of Construction Operations or ordered by the engineer will be paid for under respective items in the contract except that no payment will be made for preparing fine grade or trimming shoulders in connection with such construction.”
Under the terms of the contract undoubtedly the intention was to maintain traffic along Central Park Avenue through the City of Yonkers as much as it was possible under the circumstances of this great improvement.
If provisions for maintaining traffic were not smooth, were restricted, were because of the movement of machinery, vehicles and equipment used in connection with the work interfered with or even temporarily or for a short time completely, the damage occurring therefrom would be damnum absque injuria. That is the price of progress. Mere inconvenience does not stamp a means of access as unsuitable. (Van Aken v. State of New York, 261 N. Y. 360; Miller v. State of New York, 229 App. Div. 423; Reis v. City of New York, 188 N. Y. 58; Matter of Gillespie, 285 N. Y. 771; Coffey v. State of New York, 291 N. Y. 494.)
However, if .such interference unnecessarily or arbitrarily interfered with the approach to the premises of the claimants for long periods or continued intermittent periods, which left no doubt of their damaging effect upon the businesses of the claimants, then we have a cause for damages. Access thus has been destroyed, and an abutting owner is entitled to compensation. (Egerer v. New York Cent. & Hudson R. R. R. Co., 130 N. Y. 108; Holmes v. State of New York, 279 App. Div. 489, 282 App. Div. 278.)
The facts adduced at the trial were in substance as follows:
The claimants’ leased premises fronted on Central Park Avenue between Yonkers Avenue to the north and Boone Street to the south.
*853 When claimant Kavanaugh made his lease in May, 1955, Central Park Avenue was being dug up for the Thruway, but the area adjoining his station was not touched and was passable for traffic. His lease called for a rental of $340 per month plus % cent per gallon of gasoline sold.
Both claimants and State agree that the breaking up of the roadway affecting claimants started immediately after October 15, 1955, when the Yonkers Raceway closed. Then barricades were set up at Yonkers Avenue and heavy equipment was used on the job. Boone Street was not barricaded, but the claimants assert there were large mounds of excavated dirt which effectively prevented movement of traffic.
At Yonkers Avenue the contractor had police to direct traffic. The State’s witness said traffic was snarled at that intersection. The police directed traffic away from the claimants’ area except local traffic.
The east side of Central Park Avenue had been finished in June, 1955. North and southbound traffic was directed there when digging commenced on the west side.
The claimants assert that some 12 feet of roadway remained for a period of time in front of their premises when piling was being driven at or near Yonkers Avenue, but even this could not be used most of the time because of cars parked in front of the bank and liquor store which were immediately to the north and nearer to Yonkers Avenue and because, too, workmen on the job also took advantage of this space to park their cars.
The State concedes that when the contractor used large equipment, such as a crawler crane, the roadway was not passable, but it asserts, also, that when work was not being performed, the roadway was kept open.
A Mr. Brauer, employed by the A & P which adjoins Kavanaugh to the south, testified that the roadway was obstructed as Kavanaugh stated but could with difficulty be negotiated until Springtime when it was practically closed. Cars which patronized Kavanaugh would go through the A & P parking lot on the rear of the store and then through a broken fence between those two properties to Kavanaugh’s Service Station.
Towards Springtime the whole roadway was dug up about one and one-half feet below the sidewalk in front of both claimants’ premises. This condition, obviously bad, uneven, indifferent to the conditions of the contract to maintain traffic at all times and the rights of these claimants, did not invite business but rather repelled it, for springs could be broken and other damage could be sustained on vehicles hardy and foolish enough to go over such difficult terrain.
*854 There were impediments here which amounted not merely to necessary construction work but substantially to a prohibition of use of the small portion of the westerly side of Central Park Avenue which was theoretically made available for the traveling public. The photographic exhibits of both sides furnish an effective exhibit of this impassable condition.
In January, 1956, the Sun Oil Co., which was Kavanaugh’s lessor, reduced the lease rental from $340 per month to $40 per month to March, 1956, when the roadway was expected to be rebuilt. It was not till July, 1956, that the roadway became passable.
In the meantime, at Beck’s, there was a strike in the service department from August 17, 1955 to February 10, 1956. The sales department of Chevrolet products was not affected by the strike.
For claimant Beck, his accountant testified to a variation in the sales of cars, new and old, and service income and miscellaneous items between October, 1954 and June, 1955, and October, 1955 and June, 1956, totaling $669,966 indicating a net loss to him of $6,659.48.
The claimant Kavanaugh also used the period of October, 1954 to June, 1955 and October, 1955 to June, 1956 to indicate to the court the loss in gallonages per month. In the first period he bought and sold 294,764 gallons of gasoline and in the second period 86,990 gallons. The variations were similar with regard to oil, grease and services. He claims a net loss of $4,155.48. These figures were not controverted.
Both claimants also sued the contractor on a similar basis of facts. These cases were settled in the Supreme Court of Westchester County, Kavanaugh receiving $2,500, and Beck receiving $2,375, which amounts will be deducted from their awards, since a claimant cannot recover twice for the same damage.
Although the roadway was not always actually closed, its shutting off and the setting up of impediments to travel were almost continuous. The evidence indicates that there was a complete destruction of access or a failure of suitable access to the property. (See A. E. Nettleton Co. v. State of New York, 11 A D 2d 899; Crear v. State of New York, 2 A D 2d 735.) This was no mere inconvenience. Under the circumstances, the court feels that there has been shown a situation tantamount to the closing of the roadway, persisting for such a length of time as to cause substantial damage to claimants. This constituted an abuse by the State and the contractor of the State’s right to make improve *855 ments for the benefit of the public with necessary and attendant restriction of the unhampered use of the highway by vehicular traffic. While the State, acting under proper statutory authority, may close a highway, a suitable means of access must be left to an abutting owner, or else he is entitled to compensation.
The case of Holmes v. State of New York (279 App. Div. 489) involved the question of whether claimants were provided with a suitable means of access to their property. In ordering a new trial on this issue, the Appellate Division held as follows:
‘ ‘ However we are not in accord with the finding below that claimants were left a suitable means of access to their property. It is true that either the State or a municipality may close a street, if acting under proper statutory authority, but a suitable means of access must be left to an abutting owner or else he is entitled to compensation (Egerer v. New York Central & Hudson R. R. R. Co., 130 N. Y. 108). What may be a suitable means of access is of course a question of fact. Mere inconvenience does not stamp a means of access as unsuitable (Van Aken v. State of New York, supra; Miller v. State of New York, 229 App. Div. 423; Reis v. City of New York, 188 N. Y. 58). The proof in this claim persuades us that considerably more than mere inconvenience of approach is involved. The cut-off from West Avenue to Erie Street is very sharp on a descending grade, and too narrow for trucks, weighing a ton and a half or more, to pass. Prior to the closing of the west entrance to Erie Street Extension over 90% of claimants’ business was transacted with farmers who called at the feed mill for their purchases, and the proof indicates that an average of fifty customers called there daily. Since the commencement of construction the delivery system of claimants at their door has been almost completely reversed, and they are now compelled to deliver over 90% of their merchandise to their customers. The testimony of experts on both sides shows quite clearly that claimants suffered substantial damages by reason of a change of access.
“We are constrained to hold that the finding of the court below to the effect that claimants were not cut off from all other suitable means of ingress and egress is against the weight of evidence.”
On the retrial of this claim, claimants were allowed additional damages for loss of business incurred because of the difficulty of access. (Holmes v. State of New York, 204 Misc. 9.) The Appellate Division affirmed, holding that the evidence established that claimants suffered substantial damage, and that ‘ The only remaining access, after the street closing, was roundabout, nar *856 row, involved difficult turns and meeting places, to which claimants’ former customers would not submit.” (Holmes v. State of New York, 282 App. Div. 278.)
The court therefore finds that the State was negligent in not enforcing the terms of its own contract, which negligence was the direct and proximate cause of the damage sustained.